UNION TRUST COMPANY OF MARYLAND, Trustee, et al *vs.* THE BELVEDERE BUILDING COMPANY OF BALTIMORE CITY et al.

*Mortgage by corporation to secure bonds—Default in payment of taxes on corporate stock authorizing foreclosure and sale—Sufficiency of request by bond-holders to authorize sale—Insolvency of corporation maturing its outstanding obligations.*

A mortgage to a trustee of the property of a hotel company to secure the payment of bonds, contained a covenant by the mortgagor to pay promptly all taxes on the property and provided that if the mortgagor should allow any tax to fall in arrear, or any lien to be obtained on the property whereby the security of the mortgage may be impaired, or should fail to perform any of the convenants therein contained, and in

case either of the defaults continued for nine months, then the trustee, upon the written request of the holders of one-fourth of the bonds in amount secured by the mortgage might take possession of the property or, after or without such entry, might proceed to sell the same. The trustee filed a bill in February, 1906, alleging that the mortgagor had made default in failing to pay a certain sum stipulated to be paid for the sinking fund, and had failed to pay the taxes for the years 1905 and 1906, and that the default as to the taxes for 1905, had continued for more than nine months and that they constituted a lien on the property. Under the bill, receivers were appointed to take charge of the property and afterwards the trustee petitioned for a sale under the mortgage. Code, Art. 81, sec. 47, provides that all taxes shall be liens . on the real estate of the party indebted from the time they are levied. Under Code, Art. 81, secs. 150 and 159, taxes on the shares of stock of corporations are payable by the corporation, are liens on its property, and in case of insolvency, are entitled to priority. Such taxes are levied in the month of May of each year as of the first of January next · preceding and are in arrear on the succeeding January first. In this case, the mortgagor company had failed to ·pay the taxes on its capital stock for the years 1904 and 1905 and they were liens on the real estate of the company from the dates of their levy in May 1904 and May 1905. *Held*, that the failure of the mortgager to pay these taxes was a default under the provisions of the mortgage relating to the payment of taxes and the creation of liens, and entitled the trustee to make sale of the property under the first mortgage.

When a mortgagor has made default in the payment of taxes as required by a covenant of the mortgage, the subsequent payment thereof does not divest the right of the mortgagee to foreclose and sell under the mortgage founded upon such default.

*Decided April 2nd, 1907.*

UPON MOTION FOR RE-ARGUMENT.

A mortgage to secure an issue of bonds provided that in the event the mortgagor should suffer any tax to fall in arrear, or any lien to be obtained on the mortgaged property or should fail to perform any of the convenants therein contained, then the trustee, might upon the written request of the holders of one-fourth of the bonds in amount, either take possession of the property or proceed to sell the same. After the mortgagor had become insolvent, and after taxes had fallen in arrear and a lien thereby created, the request of the bondholders to the trustee for a sale referred in general terms to certain defaults of the mortgagor and specifically mentioned as one of the grounds of the request, the insolvency of the mortgagor. *Held*, that this was a sufficient request by the bondholders to the trustee to exercise such power of sale.

When a corporation executes a mortgage to secure an issue of bonds pay-

able at a future time, the adjudicated insolvency of the corporation and its dissolution, prior to that time, operates to mature the bonds at the option of the holders thereof, and entitles them to a decree for a sale under the mortgage.

*Decided May 1st, 1907.*

Appeal from the Circuit Court of Baltimore City (NILES, J.)

The cause was argued before BRISCOE, BOYD, PEARCE, SCHMUCKER, BURKE and ROGERS, JJ.

*Fielder C. Slingluff, T. Wallis Blakistone* and *Joseph C. France,* for the appellant.

*Bernard Carter,* for committee of second mortgage bondholders, appellees.

*Arthur Geo. Brown* (with whom was *J. Hanson Thomas* on the brief), for Wells Bros. Co., third mortgage bondholders, appellees.

*Geo. Dobbin Penniman,* for Ella K. Perin, appellee.

*John P Poe,* filed a brief on behalf of the unsecured creditors.

PEARCE, J:, delivered the opinion of the Court.

It will be necessary to a proper understanding of this case that the facts be stated in somewhat full detail before considering the law applicable to the facts.

The Belvedere Building Company of Baltimore City is a corporation formed under the general incorporation law of the State of Maryland, April 10th, 1901. The certificate of incorporation states that it was formed "for the purpose of buying, selling, mortgaging, leasing, improving, disposing of, or otherwise dealing in lands in this State, and also for the purpose of carrying on in the city of Baltimore, the industrial business of conducting a hotel in all its branches, the aforesaid purpose being, in the judgment of those forming said corporation, of advantage to the general interests of said corporation," and the aggregate capital stock of the corporation was

fixed at $500,000, divided into 5,000 shares of the par value of $100 each.

Under its corporate powers, and in pursuance of proper authority from its directors and stockholders, it was determined to issue its first mortgage bonds to the amount of $850,000 in order to pay for the erection, equipment, and furnishing of a hotel building upon a lot of land at the southeast corner of Charles and Chase streets in Baltimore City owned by it, and also its second mortgage bonds to the amount of $500,000, for the erection, equipment and furnishing of said hotel building; and accordingly on June 20th, 1902, said corporation executed to the appellant, the Union Trust Company of Maryland, trustee, its mortgage upon the parcel of ground at the corner of Charles and Chase streets on which the Belvedere Hotel was then in the course of erection, together with all the improvements and machinery thereon when and as erected, and all the rights, privileges and franchises connected with said hotel in any manner, to secure the said first mortgage bonds mentioned, to the amount of $850,000, said bonds being for $1,000 each, payable on January 1st, 1923, with interest in the meantime semi-annually at the rate of five per cent, payable on the first day of January and July in each year; and on June 16th, 1903, said corporation executed to the said Union Trust Company, trustee, its mortgage upon the same property described in the said prior mortgage, and also upon all the furniture, equipment, machinery and supplies that should be placed in said hotel, to secure said second mortgage bonds to the amount of $500,000, said bonds for $1,000 each payable October 1st, 1918, with interest in the meantime payable semi-annually at the rate of five per cent on the first days of April and October in each year.   It also executed a third mortgage on May 27th, 1904, to the Fidelity and Deposit Company of Maryland, as trustee, to secure its bonds for $150,000, held by Wells Bros. Company, for work done by them on said hotel building.

The whole amount of bonds secured by these three mortgages were issued concurrently with the execution of said

mortgages. It does not appear in the record by whom all of these bonds are now held nor is it material that this should appear, but the record does disclose the fact that the Union Trust Company of Maryland holds in its own right $620,000 of the first mortgage bonds, and that Ella K. Perin as life tenant under the will of Nelson Perin, now deceased, holds $134,000 of the first mortgage bonds.

It also appears that of the second mortgage bonds, Ella K. Perin holds $120,000, The Merchants' National Bank of Baltimore, $30,000, Hambleton & Co., $10,000, Citizens' Nat. Bank of Baltimore, $10,000, U. S. Fidelity & Guaranty Co., $20,000, W. P. Harvey, $30,000, Parker and Thomas, $14,000, and the Sherwood Distilling Company, $8,000, and that of the 3rd mortgage bonds, $68,000 are yet held by Wells Bros. Company, and that there are unsecured creditors whose claims amount to a large sum of money. The bondholders above named have all been made parties to the proceedings at some stage, and McDowell & Co. holding an unsecured claim of $3,133.34 have also come in by petition, acting in their own behalf and in behalf of other unsecured creditors.

On February 10th, 1906, The Union Trust Company of Maryland, Trustee, filed its bill in the Circuit Court of Baltimore reciting the first mortgage above mentioned so far as necessary to the case, and especially alleging that in the second article of said first mortgage, the said mortgagor covenanted that on January 1st, 1906, and annually thereafter and so long as any of said bonds remained outstanding and unpaid it would pay to the plaintiff the sum of $12,500 for the purpose of constituting a sinking fund for the payment of said bonds at maturity; that by article 13 of said mortgage, the said mortgagor further covenanted to pay promptly all taxes and assessments, lawfully assessed against *the property mentioned in said mortgage,* so long as any of said bonds should be outstanding; that by article fourth of said mortgage it was provided that if the mortgagor, its successors or assigns, should at any-time, after demand made, neglect or omit, for any period exceeding nine months, to pay semi-annual interest on

said bonds, or to pay the principal sum of each bond for any period after the maturity thereof, "or shall suffer or allow *any lawful tax or charges to fall in arrear, or any lien to be obtained on the said property, whereby the security of this mortgage may be impaired,* or shall refuse or fail to keep or perform any of the covenants or stipulations contained herein, then, in either of such events, in case the same continue for nine months, the plaintiff might upon the written request of one-fourth the amount of bonds there-by secured enter upon and take possession of the mortgaged premises, and apply the net revenue and income therefrom as stipulated in said mortgage; or after, or without entering as aforesaid, upon the written request as aforesaid might proceed to sell and dispose of said mortgaged real estate, corporate rights and franchises; that it was further provided by said article fourth that in case of any default in any matter or thing to be done or performed by the mortgagor, according to the requirements of said bonds or of said mortgage, the plaintiff should be authorized to apply to any Court of competent jurisdiction in the State of Maryland for the appointment of a receiver, or receivers of the mortgaged property and franchises, and that the Court should forthwith appoint such receiver or receivers, and if named or designated as such by the plaintiff, that such appointment should be made by the Court as a matter of strict right to the trustee and to the bondholders, and without reference to the solvency or insolvency of the mortgagor.

The bill then alleged that the defendant had made default. 1st in failing to pay on January 1st, 1906, to the trustee, the sum of $12,500 or any part thereof, for said sinking fund; 2nd. In failing and omitting to pay "the properly levied and assessed State and City taxes upon the property, real and personal, conveyed by said mortgage deed of trust for the years 1905 and 1906 as covenanted in article 13, which taxes are in arrears under section 40 of the City Charter, and are liens upon said property prior to the aforesaid deed of mortgage, and the security conveyed thereby is impaired by the failure to pay said taxes." The bill then further averred that

the failure to pay promptly the taxes for the year 1905 had continued for a period of more than nine months, and the contingency had arisen under which the plaintiff was authorised to enter upon and take possession of said mortgaged property, or to exercise the power of sale before mentioned, or to apply for and have appointed a receiver or receivers as aforesaid; that the plaintiff deemed it necessary and expedient to exercise its rights and obligations under said mortgage and to take possession of the mortgaged property for the purpose of sale, and that it was the plaintiffs intention to sell the same as soon as it could be advantageously done, and that it deemed it necessary that a receiver or receivers should be appointed to continue the business of the defendant until the further order of the Court.

The prayer of the bill was, first, that the Court would assume control of all the trusts reposed in the plaintiff, and direct the proceedings as to the sale of said property, second that a receiver or receivers should be appointed; third, that an injunction should issue restraining the defendant's officers or servants from interfering with the receivers; and fourth, for general relief.

On the same day the defendant answered admitting all the matters and facts stated in the bill, consenting to the appointment of receivers, and recommending Edgar G. Miller, Jr., as a receiver on behalf of the defendant and its stockholders representing the $508,300 of capital stock of the corporation.

On the same day an order or decree was passed.     1st. Assuming jurisdiction of all the trusts confided to, and the powers to be exercised by the trustee under said mortgage.

2nd. Authorizing the trustee to sell the property mentioned in the proceedings, under the direction of the Court, and subject to its ratification.

3rd. Appointing George Blakistone and Edgar G. Miller, Jr., nominated by the Union Trust Company, as receivers, to take charge of the property until sold.

4th. Granting the injunction as prayed.

A second bill was filed by the plaintiff as trustee under the

second mortgage on February 14th, 1906, for the sale of the hotel property, its furniture and furnishings, the allegations being similar to those in the first bill. A similar answer was filed thereto on the same day and a similar order was passed directing in addition to a sale of the hotel, a sale of the furniture and furnishings which were only embraced in the second mortgage. These two cases were consolidated, and on March 19th, 1906, Lawrence Perin, a stockholder of the defendant corporation, holding one hundred shares of its capital stock of the par value of $100 each filed a bill in the Circuit Court of Baltimore City under Art. 23, secs. 264 and 264A of the Code of Public General Laws of Maryland, being the insolvent law for corporations, alleging that the defendant had outstanding a number of promissory notes for debts incurred in furnishing the hotel; that a few days before that time a judgment had been entered against the defendant for $10,000, in favor of Olin Bryan for personal injuries sustained in an accident in the hotel elevator, and that the defendant also owed about $24,000, for overdue State and city taxes, none of which the defendant was able to pay, and that the defendant was then insolvent. The bill recited the filing of the two previous bills, and prayed for a decree adjudging the defendant to be insolvent, and to have surrendered its corporate rights and franchises, and that it be dissolved and its assets be distributed among those entitled according to their respective rights and priorities, and that receivers be appointed to take charge of the assets of the defendant. An answer was filed the same day by the defendant, admitting all the allegations of this bill, consenting to the appointment of receivers, and suggesting Messrs. George Blakistone and Edgar G. Miller, Jr., as such receivers.

On March 21st, upon petition of Lawrence Perin, the consolidated causes of the Union Trust Co. against The Belvedere Building Company were consolidated with the last mentioned cause of Lawrence Perin against the same defendant, and the same receivers appointed in the two causes above mentioned were appointed receivers in the three consolidated causes, with

all the rights and powers conferred by their previous appointments, and in addition thereto all the other powers which can be conferred upon receivers appointed under Art. 23, relating to the dissolution of insolvent corporations, with a proviso however that that order should not be deemed in any manner to affect the rights and privileges of the Union Trust Company of Maryland under the mortgages referred to in the two causes of said Union Trust Company against the Belvedere Building Company, or under the decrees passed in said causes.

On March 27th, 1906, The Belvedere Building Company filed a petition for leave to file amended answers to the two bills of the Union Trust Company, alleging that there had been no default by the defendant under said mortgages, and that the defendant had been inadvertently led into making an erroneous admission of default, and praying that so much of said answers as consented to a sale should for that reason be stricken out; and subsequently Wells Bros. Company and Ella K. Perin, before mentioned, also intervened by petition and asked that said orders of sale be stricken out. The ground upon which these petitions were filed is set out in the petition of the Belvedere Building Company at much length, the substance being that the averments of these two bills that the failure to pay the taxes for the year 1905 had continued more than nine months when the bill was filed on February 10th, 1906, was not true, since the nine months would begin to run from July 1st, 1905, at which time under sec. 40 of the City Charter, taxes on real estate and chattels real are in arrear and that therefore the nine months had not expired on February 10th, 1906; and although the said section of the City Charter also provided that taxes on personal property should be in arrear on May 1st, 1905, of the year in which they were levied, so that if the defendant were taxed on any personal property, and such taxes for 1905 had been in arrears on February 10th, 1906, they would then have been in arrears for nine months, yet the *defendant* was not taxed with any personal property, because under the law of Maryland, corporations having a capital stock on which taxes are assessed, are not taxed on their

personal property, the tax on which is represented by the tax on their stock.

The petition admitted that the taxes assessed on the defendant's capital stock were in arrears for more than nine months when these bills were filed, but contended those taxes are not the taxes contemplated by the terms of the mortgage which provides that if the defendant "shall suffer any taxes or charges to fall in arrear or any lien to be obtained on the said property whereby the security of this mortgage may be impaired" then a sale may be made. Amended answers were accordingly filed denying any default. The Union Trust Company answered the petition of the defendant repeating the averment of default contained in the original bills, namely that there was a default in the non-payment of taxes agreed to be paid under said mortgage for a period of more than nine months, and that this default was twice admitted by the answers filed to the two original bills, at separate and distinct dates, and that said decrees having been enrolled the defendant is bound thereby. The Union Trust Company further answering, said that there is a conceded default in the payment of the taxes on the real estate, but that the defendant contends that this default has not existed for nine months as stipulated by the mortgage, but that this right has been waived by the defendant's answer, and it is now too late to avail of that ground.

This petition of the defendant and the answer of the plaintiff were heard, and on April 27th, 1906, the Court revoked and rescinded so much of the decrees of February 10th and 14th, 1906, passed in the two causes of the Union Trust Company against the Belvedere Building Company, and consolidated with the case of Laurence Perin against the same defendant, as provided for a sale by the Union Trust Company, trustee, of the property described in said mortgages respectively, and also modified the order of March 21st, 1906, so far as related to the rights of the Union Trust Company under said mortgages and decrees so as to conform in all respects with this order, and its effect upon said orders or decrees of February 10th and 14th, 1906.

So the matter stood until October 31st, 1906, the receivers in the meantime conducting the hotel when one of the receivers, Mr. Miller, filed a petition, asking the Court to determine whether a sale should be made, and if so, how, when, and by whom. Thereupon the Union Trust Company filed its petition on November 9th, 1906, referring to the previous proceedings, repeating the allegations of a default made and continuing for nine months, and stating the failure of a proposed plan of reorganization of the defendant's finances, and the consequent urgent necessity of a sale; stating also that the holders of one-fourth in amount of the first mortgage bonds have in writing directed the trustee to declare the whole principal sum of said bonds to be due and payable, and that said trustee had so declared, and prayed for an order authorizing the trustee to sell under the powers contained in said mortgage, at such time and on such terms as the Court should prescribe.

This petition was resisted by the defendant and the other intervening parties, and on December 6th, 1906, the Union Trust Company amended its last mentioned petition so far as the prayer for relief was concerned—so as to ask specifically for a dissolution of the defendant corporation, and also in event that the Court should determine the sale should not be made by the trustee under the mortgage, but by the receivers in the three consolidated causes, that then such sale should be made free and clear of the first mortgage held by the plaintiff as trustee, so that the Union Trust Company could be paid from the proceeds of sale, the amount due it under said mortgage, and in event of deficiency be put in position to prove its claim for such deficiency in the insolvent Court.

The whole matter then came up for hearing, and the Court then passed the following decree from which this appeal is taken:

1st. That the Belvedere Building Company is, and was at the time of the filing of the bill of complaint by the Union Trust Company, insolvent, and has lost its corporate rights and privileges.

2nd. Declaring the Belvedere Building Company to be dissolved.

3rd. Ordering a sale of all the property real and personal of the Belvedere Building Company, to be made by the receivers, subject to the liens and terms of the two mortgages held by the Union Trust Company as trustee, and prescribing the manner and terms of sale.    Among these terms of sale is a provision that a sale to the highest bidder would not be ratified unless before final ratification, satisfactory evidence should be produced to the Court, that the purchaser would within thirty days after ratification supply thirty-five thousand dollars, as a working capital for the operation of the hotel, and that within six months after ratification, the purchaser would expend in the necessary repairs of the hotel such amount as should be by the Court ascertained and determined, at least ten days before the day of sale, to be reasonably sufficient for that purpose.

It is obvious from the foregoing statement of facts that this is simply a contest between the first mortgage bondholders on the one hand, and the second mortgage bondholders and the unsecured creditors on the other hand, as to whether the sale shall be made clear of, or subject to the lien and terms of the first mortgage held by the Union Trust Company as trustee for itself and other holders of the first mortgage bonds, since the Belvedere Building Company admits its insolvency, and the Union Trust Company is willing to waive its alleged right to sell under the first mortgage if the receivers should be directed to sell free and clear of its mortgage so that a complete settlement of all the affairs of the Belvedere Building Company should be made as a result of the sale.

In so saying, we are not unmindful of the fact that Mrs. Ella K. Perin, who is the holder of $134,000 of the first mortgage bonds, is resisting a sale thereunder; but she is also the holder of $120,000 of the second mortgage bonds, and her mixed and nearly balanced interest naturally range her with those who oppose a sale under the first mortgage.    Under the decree made, she will at least have a chance of continuing the investment represented by both series of bonds, with the assurance of continued protection in event of future defaults

by those who may be in charge of the conduct of the hotel, and her second mortgage bonds would increase in value in proportion as future compliance may be made with the provision for sinking fund payments on the first mortgage bonds. But with the wishes or mere interests of the respective parties we are not permitted to be concerned. It is the rights of the parties alone which we are authorized and required to determine. The primary question therefore, and one which is fundamental in this case, is whether there had been any such default at the time of filing the first bill by the Union Trust Company, trustee, as gave a right to sell under said first mortgage, for if there was such right, it cannot be denied by any decree of a Court whose jurisdiction was invoked not to destroy, but to direct and regulate the exercise of the power of sale created by the terms of the mortgage and which might have been exercised without resort to the Court for authority to make such sale, and which sale would have been brought within the jurisdiction of the Court upon the filing of the bond required as preliminary to the exercise of the power of sale—only for the purpose (if the power was found to exist) of proper control over the making of the sale authorized by the mortgage, and the distribution of the proceeds of sale.

In our opinion the question above stated is concluded by the *Casualty Insurance Company case*, 82 Md. 535.

We have seen from the reference heretofore made to the first mortgage, that article four provides that if the Belvedere Building Company should "suffer or allow any lawful tax or charges to fall in arrear, or any lien to be obtained on the said property whereby the security of this mortgage may be impaired," and if this condition should continue for the period of nine months, then, with or without entering into possession the Union Trust Company was authorized, upon the written request of the holders of at least of one-fourth in amount of said bonds, to proceed to sell all said real estate, corporate rights and franchises at public sale, and to apply the proceeds "after deducting therefrom proper allowances for all the expenses thereof including attorney and counsel fees, and all other ex-

penses, additions or *liabilities* which may have been paid or in-
curred by it for *taxes or assessments* on the said property, or
the appurtenances, *or other property thereto belonging* or any
part thereof, and the payment to the trustee or any bond-
holder, of any advances made under the provisions of article
seventeen of this indenture, as well as reasonable compensation
for its own services; to apply the residue of the proceeds of
sale to the payment of the whole amount of the unpaid prin-
cipal of said bonds then outstanding, and of the whole amount
of the interest at that time accrued and unpaid, *pro rata* with-
out preference or priority, and ratably to the aggregate amount
of such unpaid principal and accrued and unpaid interest."

We have also seen that in the petition of the Belvedere
Building Company of March 27th, 1906, for leave to amend
its answer to the bill in which the default charged therein in
the non-payment for more than nine months of the State and
city taxes for 1905 on its real and personal estate, there is an
express admission by the Belvedere Building Company that
the taxes for 1905 upon its capital stock were in arrear for
more than nine months when the bill was filed, but the petition
denied that these were the taxes contemplated by the language
of article four above quoted, because the petition alleged "It
is obvious that these taxes cannot impair the security of the
mortgage, *for the reason that such taxes are not a lien upon the
real estate of the defendant, being primarily assessed to the stock-
holders, although the duty of paying them is imposed upon the
corporation.*"   It is quite clear, however, that the stipulation
of article four which we are now considering, has a wider
scope and operation than the covenant of article thirteen,
which requires prompt payment "of all taxes and assessments
lawfully assessed against the property herein mentioned," that
property being the lot of ground with the hotel erected thereon,
and all the improvements, machinery, and appurtenances be-
longing thereto.   *That covenant* would be performed by
prompt payment of taxes upon the real property described in
the mortgage.   The stipulation of article four must necessarily,
and in accordance with its more general language, have been

designed to provide for any other charge or lien however created, and however operating, so as to impair the security of said mortgage, and any lien which would have priority over said mortgage must operate to impair its security. All taxes in any manner chargeable upon any specific property take precedence over all other liens, and tax sales divest the title of the owner of the fee and transfer the lien of all incumbrances from the property to the fund created by the tax sales. It is therefore to just such a charge or lien as that claimed for the tax upon the capital stock in this case, if it be a lien, that the stipulation of article four must apply. Another obvious illustration of such a lien would be that created by an assessment for benefits imposed under any scheme for improvements of the streets—such as paving or sewering. In the *Casualty Insurance Company case*, 82 Md. 534, that company having been adjudged to be insolvent, receivers were appointed to take charge of its assets, and had in their hands funds arising therefrom some of which were special and some general funds. The Mayor and City Council of Baltimore filed a claim for taxes, and this Court speaking through CHIEF JUDGE McSHERRY said two questions were presented.

"First, Whether the tax levied by the municipality for the year eighteen hundred and ninety-three upon the shares of the stock of the company held by the residents and non-residents is a debt due and payable by the company or only collectible from the shareholders; and secondly, if the tax be a debt due and payable by the company, is it a prior lien over the claims of all other creditors? These taxes cannot, of course be considered a debt due by the company unless they are made so by statute, because the shares of stock are the property of the shareholder, and under the Code must be valued to him. But the Code further provides that the shares of stock of corporations owned by residents or non-residents of the State shall be valued at their actual cash value but the tax assessed on such stock shall be levied and collected from the corporation, and may be charged to the account of such non-resident stockholders, and shall be a lien on the shares

held by them respectively—Code 1888, sec. 138, as to non-residents, and sec. 141, as to residents.   The statute thus makes explicit provision for a certain and prompt method of collecting the taxes due upon shares of stock, whether held by residents or non-residents, by imposing upon the corporation the obligation and the duty to pay the tax itself.   In the case of shareholders not residing in this State it is the only mode in which the State can reach their shares for taxation.   *Nat. Bank* v. *Kentucky*, 9 Wall. 353.   And when this Court came to deal with the same question, *American Coal Co.* v. *Co. Comrs. Al. County*, 59 Md. 197, we held that the statute having created the duty and obligation to pay when the shares are assessed to the individual owners, that duty and obligation on the part of the corporation may be enforced by a proper action at law.   If these taxes are a debt due by the corporation they are a debt due by it and to be paid by it, regardless of any dividends or profits payable by the corporation to the shareholder and out of which it might be reimbursed. *New Orleans* v. *Houston*, 119 U. S. 265.,  Though this is conceded to be so whilst the corporation is a going concern, the contention is that when the company becomes insolvent and its property has passed into the hands of receivers, such taxes cannot be held to be a debt of the corporation for the payment of which its assets are liable.   In reply to this, it may be observed that the tax is by the express terms of the statute charged to and made payable by the corporation.   If this be so, and if the tax was due at the time of the insolvency, then obviously the insolvency could in no manner affect the right of the city to demand payment out of the company's assets. *   *   *   These taxes were due when the company's assets passed into the hands of the receivers, and being then due the Act of 1892 directs that they shall be paid and satisfied by the officer or person selling under judicial process the property real or personal upon which such taxes are payable.

"*As these taxes were due and payable when the company became insolvent, they are, in our opinion a prior lien upon the assets in the hands of the receivers and must be paid out of the*

*general fund, and if that should be insufficient the balance must be paid out of the special fund."*

We are not able to discriminate that case from the present. It will be observed that the point of time when the taxes in the Casualty Insurance Company case were determined to be a prior lien upon the assets of the company was when the insolvent company's assets passed into the hands of the receivers, and in this case that occurred on February 10th, 1906. The demand of one-fourth in amount of the bondholders, that the sale should be made was duly made November 24th, 1906. It is true that the tax upon the capital stock of the company was paid October 10th, 1906, by whom does not appear, but this payment after a consummated default, by whomsoever made, or upon whatever authority, can not obliterate the default, or divest any right to sell founded thereon. We are therefore of the opinion that this default, followed by the proper demand of one-fourth in amount of the bondholders, entitled the Union Trust Company as trustee, to a decree of sale under its mortgage, and that there was error in refusing such decree, and in directing a sale by the receivers subject to said mortgage.

Other interesting questions, involving the effect of the dissolution and insolvency of the Belvedere Building Company upon the maturing of the mortgage bonds, under the peculiar terms and stipulations of the mortgage in reference thereto, and as to the effect upon intending purchasers, of the somewhat unusual provisions of the decree requiring the furnishing of a working capital of $35,000, and a stipulated sum for repairs, by the person reported as purchaser, as a condition of ratification of the sale, were argued with great ability but in view of the conclusion we have reached, it will not be necessary to consider those questions.

> *Decree reversed, and cause remanded that a decree may be passed in conformity with this opinion. The costs above and below to be paid out of the proceeds of sale.*

A motion for a re-argument was subsequently made and in disposing of the same,

PEARCE, J., delivered the opinion of the Court.

Since filing the opinion in this case the appellees have made a motion for reargument, and in the brief filed in support of their motion they contend that we reached the wrong conclusion as to the existence of any such default by the Belvedere Building Company as gave the appellant the right to a decree for sale under its mortgage.

The authorities relied on are *Hull* v. *Southern Development Co.*, 89 Md. 8, and *Baltimore* v. *Chester River Steamboat Co.*, 103 Md. 400. It is contended upon these cases that until suit had been brought for recovery from the Belvedere Building Co. of the taxes of 1904 and 1905, and judgment obtained therefor, such taxes were not liens upon the property of the Hotel Co. The 89th Md. case was an appeal by a tax collector from an order setting aside a sale of a corporation's real estate by such collector for taxes upon shares of stock assessed to the owners of such shares, the collector having attempted to sell under a distraint. That case did not decide whether, or when such taxes became liens upon the property of the corporation, nor when they became due and in arrear. It only decided, in the case of a going concern, that upon failure to pay such taxes the property owned by the corporation cannot be distrained by the collector and sold by him, and that the only method by which the *collector* could enforce payment was by obtaining judgment and issuing execution thereon, but it did not decide when such taxes become liens on the property of the corporation, nor did the case in 103 Md. so decide. But sec. 47 of Art. 81 of the Code provides that "All State, County, or municipal taxes shall be liens on the real estate *of the party indebted* from the time the same are levied." The *Casualty Insurance Company's case*, 82 Md. 564, decided that the taxes assessed and levied upon the shares of capital stock of a corporation, are "*a debt due by the corporation*, and to be paid by it regardless of any dividends or profits payable by

the corporation to the shareholder, and out of which it might be reimbursed." The taxes upon these shares of stock were therefore *debts* due by the Hotel Co. and the Hotel Co. was "the party *indebted*" for payment of such taxes, and by sec. 156 of Art. 81, such corporation is given "a lien on the shares of stock therein held by such stockholders respectively until paid," just as the State, county, or municipality is given a lien on the real estate of the corporation charged with the payment of such taxes.

Under sections 150 and 159 of Art. 81, the State Tax Commissioner is required annually, by the 15th day of May in each year, to assess the shares of stock of all incorporated institutions, as of the first day of January next preceding, and to levy the State taxes prescribed by law upon the same; and in *Baltimore* v. *Chester River Steamboat Co.*, 103 Md. 408, it was held that county and municipal taxes were within the reason of the law and the reason applies to these with the more force since "they are the larger and more burdensome part of taxation under our system." In this case the taxes for nineteen hundred and four were levied at least as of May 15th, 1904, and those of 1905 as of May 15th, 1905, and were made liens on the real estate of the Hotel Co. from the respective dates of their levy though not due and in arrear for the purposes of collection until January 1st, 1905, and January 1st, 1906, respectively. The bill was filed in this case February 10th, 1906. There were, therefore, two clear defaults, separate and distinct under Art. four of the mortgage in suffering or allowing any lawful tax or charge to fall in arrear, or any lien to be obtained on the property of the corporation whereby the security of said mortgage might be impaired and in allowing said lien to continue for the period of nine months.

The Court did not say in the Casualty Company's case that the taxes only became a lien on the property of the company at the date when it became insolvent, and the writer of the opinion in this case is responsible for the inaccurate and misleading language which erroneously referred to the date of insolvency as the date of the creation of the lien.

What the Court actually did say in the Casualty Insurance Company's case was this: "As these taxes *were* due and pay-able when the company became insolvent, they are in our opinion, prior liens upon the assets in the hands of the receiv-ers." The Court said this was so, because, as it had just be-fore said, "these taxes being then overdue the Act of 1892, ch. 518, directs that they shall be paid and satisfied by the officer or person selling under judicial process the property, real or personal upon which such taxes are payable." It was sufficient in that case to determine that the taxes were an ex-isting lien at that date, without determining for how long pre-viously they had been a lien, but the only logical reason why these were liens was because they constituted a *pre-existing lien* upon the property from the date of levy, which lien the Act of 1892, ch. 518, transferred to the proceeds of sale.

In the brief on the motion for reargument it was also con-tended there was no sufficient request of the bondholders upon the trustees to exercise the power of sale.

Article 4 of the mortgage provides two modes of procedure in event of default by suffering any lien to be obtained whereby the security of the mortgage might be impaired, or in default of any of the covenants or stipulations therein.

1st. Upon request of one-fourth of the bondholders in amount, to enter upon and take possession of the mortgaged property and to conduct and manage it through servants or receivers applying the income to expense of management—then to interest on bonds—and then to principal as the bonds should mature.

2nd. Or, with or without entering into possession, upon like request from bondholders, to *proceed to sell and dispose of* all the real estate, corporate rights and franchises and to con-vey the same to the purchaser or purchasers *free from all and every trust thereby created.*

The trustee entered upon the filing of the bill of Feb. 10th, 1906 and has ever since continued to conduct and manage the affairs of the company through its receivers appointed under that decree and the subsequent orders in the consolidated

cases.   On Nov. 9th, 1906, the Union Trust Co. the holder of more than one fourth in amount of said bonds by its written request instructed the trustee, because of the happening of certain defaults and contingencies to declare the whole principal sum of said bonds to be due and to proceed to sell the mortgage property, and the trustee on the same day made the required declaration and filed a petition for an order to sell and on Dec. 6th, filed an amended petition asking that the Hotel Co. be dissolved, and on Dec. 20th these petitions were dismissed by the decree for sale from which decree the Union Trust Co., and the Union Trust Co., trustee, both appealed.

The appellees contend that the request to exercise the power of sale should have set out as the ground, the default in non-payment of taxes on the capital stock, but we have seen that article 4 allowed this request to be based upon the non-performance of any covenant or stipulation of the mortgage, and the request made not only referred in general terms to certain defaults, but specifically mentioned as one of the grounds of said request, the insolvency of the company and the consequent forfeiture of its rights and franchises, this insolvency having been admitted by the company in its answer to the petition of Lawrence Perin, and the receivers previously appointed, having been reappointed by the order passed on said petition, March 21, 1906, with all the powers of receivers appointed under the law relating to the dissolution of insolvent corporations.

The appellees contend that the only grounds upon which the principal of the bonds can be declared matured are set out in articles 7, 13 and 16, those in article 7, being the event of sale by judicial proceedings or the entry of a decree for sale under the mortgage—that in article 13 being the failure to keep in force the insurance therein provided for—and that in article 16 being the failure to complete the Hotel Building with reasonable diligence.   But their argument overlooks, as we have already shown, the fact that article 4 provides that upon default in *any* of the *conditions* and *stipulations* of the mortgage upon written request of one fourth of the bondholders in

amount, the trustee might proceed to sell and convey the mortgaged property corporate rights and franchises, free from every trust thereby created. The mortgage must be construed like other deeds, most strongly against the grantors, and effect must be given to both the modes above provided for making a sale free from all trusts under said mortgage, and upon reconsideration we are of opinion that there was a sufficient request for the exercise of the power of sale.

But apart from this view of the case we are all clearly of the opinion, notwithstanding the language of article 7, that "in no other case and for no other purpose, except as provided in this article and in articles 13 and 16 hereof, shall the principal sum of any of said bonds become due and payable before the date fixed in said bonds for the payment thereof," that the adjudicated insolvency of the Hotel Company operated to mature the bonds in question at the option of the holders thereof, and to entitle the Union Trust Company, which has exercised that option, to decree for a sale under its mortgage.

This, we think, must be so *ex necessitate rei*, because if it be not so, the mortgagee would be precluded *without its consent* from proving its claim as a creditor against the assets in the hands of the receivers. If a sale is made under a decree upon its mortgage, and that results, as it may in a deficiency of proceeds of sale to pay their mortgage debt, they can participate in the distribution of the general assets in the receivers hands and thus be put upon an equality with the other creditors of the insolvent Hotel Co. in accordance with the fixed policy of our insolvent laws. But if they are refused a decree for the sale of their collateral security, the Hotel building and lot, and a sale is decreed subject to their mortgage, the general assets will be distributed amongst other creditors, and should a default be made hereafter, at any period while these bonds are unpaid, and a deficiency occur upon any subsequent sale made under their mortgage, these bondholders will be remediless. This would be a most inequitable exercise of the powers of an Equity Court. These mortgage bonds have sixteen years yet to run. The mortgage debt is a large one even in

these days of magnificent enterprises and bold ventures. The business for which alone the mortgaged building was designed and is adapted, is in itself a precarious and uncertain one, largely dependent upon the skill and tact of the manager of the business.

The Hotel Company is no longer in existence, and all personal, or rather corporate, obligation for the payment of these bonds is destroyed and lost. The mutuality of the contract between the mortgagor and the mortgagee is destroyed.

In England the Courts have in a number of cases held that insolvency matures the outstanding obligations of a corporation.

In *Hodson* v. *The Tea Co.*, 14 Ch. Div. 862, the Court said: "It appears to me that when a company comes to be wound up, the arrangement for the continuance of a loan for a certain time necessarily comes to an end; the money becomes immediately payable and the security immediately enforceable."

And to like effect are *In re Panama New Zealand Co.*, 5 L. R. Ch. Ap. 10, and *Hubbuck* v. *Helmes*, 56 L. J. Ch. 539, and in this country, *Harding* v. *Mill River Woolen Mfg. Co.*, 34 Conn. 458, and *People* v. *Globe Mutual Life Ins. Co.*, 91 N. Y. 179.

In the last named case the Court said, "What had happened was a dissolution of the contract by the sovereign power of the State, rendering performance on either side impossible, and this result was within the contemplation of the parties, *and must be deemed an unexpressed condition of their agreement.*"

In *Jones on Mortgages*, 6 ed., vol. 2, p. 1175, it is said: "The nature of the security may be such that an event not contemplated, or provided for by the parties may give this right (the right to foreclose upon an event other than the lapse of time) as where the mortgage secures the fulfillment of an executory agreement which is to run for a fixed period, and the insolvency of the mortgagor puts it out of his power to fulfill the agreement; and therefore this works a breach of it, and gives the mortgagee the right to foreclose immediately."

Without discussing the cases in detail, but after careful consideration of the criticism by the appellee of the English cases cited and of the case from 34 Conn. as applicable to this case, we are of opinion for the reasons stated that the adjudication of the insolvency of the Hotel Company under the circumstances of this case matured the mortgage bonds held by the Union Trust Co. and that it is entitled to a decree for sale under the first mortgage.

It is neither necessary nor desirable for us to hold broadly, and as a general rule, that the mere insolvency of a mortgage corporation *ipso facto* matures the mortgage debt or authorizes the mortgagee at his election to treat it as mature. It is sufficient for our case to hold that the fact that the mortgagor Hotel Co. was judicially declared to be insolvent, in a proceeding properly instituted for its dissolution and the liquidation of its affairs, authorized the mortgagee to proceed at once to exhaust its security by a sale of the mortgaged property in order to determine the basis upon which it could participate in the liquidation.

*The motion for reargument is overruled.*